UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

JESSICA SCHLENDER,

      Plaintiff,

    v.                                                 Case No. 05-C-0618

BOULDER JUNCTION CHARCOAL GRILL,

      Defendant.

DECISION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

        Jessica Schlender sues her former employer, Boulder Junction Charcoal Grill, under Title VII of the Civil Rights Act of 1964. She asserts sexual harassment, impermissible retaliation after her complaints of sexual harassment, and pregnancy discrimination. Boulder Junction moves for summary judgment.

        Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of her cause of action, showing that there is a genuine issue of material fact for trial. *Id.* at 322-24. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question

of fact is "genuine," the opposing party must present specific and sufficient evidence that, if believed by a jury, would actually support a verdict in her favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255.

UNDISPUTED FACTS

The following facts are undisputed or are taken in the light most favorable to Schlender.

Jessica Schlender was employed as a waitress by Boulder Junction Charcoal Grill from 2002 until she was terminated on August 19, 2004. (Def.'s Proposed Findings of Fact (DPFOF) ¶ 1.[1]) Boulder Junction is a corporation organized in Wisconsin, having a principal place of business in Brookfield, Wisconsin. (DPFOF ¶ 2.) The owners of Boulder Junction include Tom LaLicata, Dino LaLicata, and Dominic LaLicata. (DPFOF ¶ 4; Pl.'s Resp. to Def.'s Proposed Findings of Fact (Pl.'s Resp.) ¶ 4; Dominic LaLicata Aff. ¶ 1; Tom LaLicata Aff. ¶ 1; Dino LaLicata Aff. ¶ 1.)

On November 18, 2003, Schlender received a written warning from Tom LaLicata, which stated: "You've been warned many times about being late for work, eating

---

[1] Unless otherwise noted, a cited proposed finding of fact (in full or on the point cited) was admitted by the opposite party.

2

during the lunch hour and also about smoking during the lunch and dinner hour. If this occurs again, you will be fired." (DPFOF ¶ 3; Rettko Aff. Ex. 9.) Schlender countersigned the written warning. (Rettko Aff. Ex. 9.)

The lunch shift for wait staff at Boulder Junction is expected to start at 11:00 a.m. (DPFOF ¶ 18.) The dinner shift has two starting times for wait staff: 4:00 p.m. and 5:00 p.m. (DPFOF ¶ 19.)

On July 27-29 and on August 10, 2004, Schlender's shift started at 5:00 p.m. (DPFOF ¶¶ 6-9; Pl.'s Resp. ¶¶ 6-9 (not disputing time that shift started).) She punched in at 5:40 p.m. on July 27, 2004; at 5:49 p.m. on July 28, 2004; at 5:39 p.m. on July 29, 2004, and at 5:27 p.m. on August 10, 2004, (DPFOF ¶ 5.) On August 17 and 18, 2004, Schlender's shift started at 11:00 a.m. (DPFOF ¶¶ 11-12; Pl.'s Resp. ¶¶ 11-12 (not disputing time that shift started).) She punched in at 11:20 a.m. on August 17, 2004, and at 11:09 a.m. on August 18, 2004. (DPFOF ¶ 5.)

Schlender was not given any verbal warnings regarding tardiness in the summer of 2004. (Pl.'s Resp. ¶ 5; Schlender Aff. ¶ 14.[2]) She had asked for and had received the permission of the Boulder Junction owners to arrive at work late for lunch shifts because she had school and day care scheduling problems that meant she was not able to consistently arrive at work on time. (Pl.'s Resp. ¶ 5; Schlender Aff. ¶ 15.) In addition, Schlender had asked for and had received the permission of the Boulder Junction owners to sometimes arrive at work late for evening shifts because of child care scheduling problems and carpooling with Dawn Farvour. As a result, Schlender and Farvour were late

---

[2] Boulder Junction says she did receive some verbal warnings in July, but Schlender says she did not and she must be believed on this point.

3

at times. (Pl.'s Resp. ¶ 5; Schlender Aff. ¶¶ 16-17; Lewison Aff. Ex. 17 (Unemployment Compensation Hr'g Tr.) at 33-39.) On August 18, 2004, Schlender received a written warning for tardiness, but Dominic LaLicata "took it back" after asking around and finding out that she was actually on time that day. (Lewison Aff. Ex. 17 at 28.)

Other Boulder Junction employees also punched in late. Based on a 5:00 p.m. dinner shift start time, for the period of June 6 to June 19, 2004, Farvour was between four and twenty-five minutes late for each of her eight shifts (Lewison Aff. Ex. 11 at 2), and in the period of July 18 to July 31, 2004, Farvour was late for each of her six shifts. (*Id.* Ex. 14 at 2) Farvour and Schlender punched in at the same time on July 27, 2004. (PPFOF ¶ 44.) Farvour punched in at 5:41 p.m. on July 29, 2004. (PPFOF ¶ 45.) On July 31, Farvour punched in at 5:21 p.m. (Dominic LaLicata Aff. Ex. A.) And, on August 10, 2004, Farvour punched in at 5:29 p.m. (PPFOF ¶ 46.) Jessica Hanson, Jennifer Heck, and Derek Gruber were late periodically (Rettko Aff. Ex. A at Resp. to Request No. 3), and Anna Kasprzak was often late (*see, e.g.*, Lewison Aff. Ex. 11 at 4 (seven of seven shifts), Ex. 12 at 4 (six of seven shifts), Ex. 13 at 3 (seven of eleven shifts), Ex. 14 at 4 (ten of eleven shifts, assuming a 5:00 p.m. dinner start time).)

Boulder Junction describes its policy regarding tardiness as follows:

> [I]f an employee was going to be late, they were to call in ahead of time to let someone in management know they were going to be late. The defendants are very lenient in regard to employees being late so long as it is not a consistent act or is a situation the employee has described to management in advance and has received their prior approval to be late.

4

(DPFOF ¶¶ 15, 17; Rettko Aff. Ex. A at Resp. to Request No. 3; Dino LaLicata Aff. ¶ 2.[3])

Schlender was the only member of the wait staff to receive a written warning for tardiness between January 1 and August 31, 2004. (DPFOF ¶ 20.) Everyone else who was tardy notified management in advance that they were going to be late, had a reasonable excuse for being late, or corrected their behavior so it was not a repetitive behavior requiring a written warning. (DPFOF ¶ 21.[4])

Ron Braun, an expediter[5] at Boulder Junction, made inappropriate remarks to Schlender, waited for her by her car, and asked her out on dates regularly. (PPFOF ¶ 47; Lewison Aff. Ex. 19 (Schlender Dep.) at 24 (stating Braun would comment "nice ass"), 26, 28-29; Rettko Aff. ERD Compl. at 1 (signed by Schlender under penalty of perjury).) Schlender asked Braun to stop, but he did not; she asked management to make him stop, and he continued. (PPFOF ¶ 47; Lewison Aff. Ex. 19 at 24-25; Rettko Aff. ERD Compl. at 1.)

Just prior to August 5, 2004, Schlender complained to Dino LaLicata that Braun had poked her in the stomach and had slapped her on her behind. (DPFOF ¶ 40.) Dino LaLicata took the complaint to Dominic and Tom LaLicata and they decided to immediately question Dennis Gilles, the executive chef, and Said Salazar, the assistant kitchen manager, to see if they had witnessed Braun poking Schlender in the stomach or

---

[3]Schlender disputes that this was the policy but points only to the fact that several other employees were often late and no one but her was disciplined. (Pl.'s Resp. ¶ 15.) However, she provides no evidence contradicting the policy requirement that an employee running late had to call or get prior approval to be late. She points to no evidence indicating that the other employees mentioned failed to call or get prior approval. (*See id.*) Thus, she has failed to rebut the DPFOF ¶ 15 adequately.

[4]Schlender attempts to dispute this proposed finding, but again provides no evidence contradicting the proposed fact that the other employees all received permission or called when they were going to be late or corrected their behavior.

[5]An expediter loads trays of food. (Lewison Aff. Ex. 17 at 26.)

5

slapping her behind. (DPFOF ¶ 41.) Gilles and Salazar informed the LaLicatas that they had not witnessed Braun doing so. (DPFOF ¶¶ 42-43.)

The LaLicatas then asked Gilles and Salazar to ask all staff on duty at the time whether they witnessed anything resembling Braun poking Schlender in the stomach and slapping her behind. (DPFOF ¶ 44.) Gilles and Salazar reported that no one on the Boulder Junction staff saw anything that resembled the incident Schlender alleged. (DPFOF ¶ 45.)

On August 5, 2004, Dominic LaLicata, on behalf of Boulder Junction, gave Braun a written warning stating Schlender's complaint against him. (DPFOF ¶ 46; Rettko Aff. Ex. 10.) Braun countersigned the written warning. (Rettko Aff. Ex. 10.)

Schlender told Boulder Junction waitress Debbie Draeger that Schlender would sue Boulder Junction if she was not treated fairly because she had complained about Braun. (Pl.'s Resp. ¶¶ 31, 37; Schlender Aff. ¶ 19.) Moreover, Schlender advised the LaLicatas that she would report Braun to the police since they were not doing anything. (Lewison Aff. Ex. 19 at 45-46, 51-52.)

On August 19, 2004, Schlender was terminated after the lunch hour. (DPFOF ¶ 13.) At that time, Dominic LaLicata telephoned Schlender and informed her that she was being fired because she was "causing too many problems around the workplace." (Pl.'s Resp. ¶ 14; Lewison Aff. Ex. 17 at 25, Ex. 19 at 49.) Schlender asked why and he said "waitresses come a dime a dozen and he didn't have time to discuss it, and then he hung up the phone on [her]." (Lewison Aff. Ex. 19 at 49-50.)

Prior to Schlender's termination, Gilles informed Dino, Dominic and Tom LaLicata that Schlender had been making threats to other employees, and that after work

6

she would talk about what was going on with certain people, and that she made the staff very uncomfortable. (DPFOF ¶ 22.) According to Files, Schlender's actions made for a stressful and tension-packed workplace. (*Id.*) Gilles informed the LaLicatas that the complaints were coming from several staff members and specifically from Draeger. (DPFOF ¶ 23.[6]) In addition, Dino LaLicata thought Schlender had a poor attitude at work and was rude to customers. (DPFOF ¶ 24; Pl.'s Resp. ¶ 24.[7])

Gilles observed Schlender over the last couple weeks of her employment and thought she was becoming sour, interrupted the harmonious flow of the restaurant, and left customers unattended. (DPFOF ¶¶ 26, 27.[8]) He relayed this to the LaLicatas prior to Schlender's termination. (*Id.*) Also, Gilles told the LaLicatas that he observed Schlender speaking on a cell phone during her work hours and that he heard her say that management didn't "know who they're f . . . with." (DPFOF ¶¶ 28, 29.[9])

---

[6]Schlender objects to these proposed findings as hearsay and because she did not make any threats to other employees. (Pl.'s Resp. ¶¶ 22, 23.) However, the statements are not used for the truth of what Gilles said but rather for an understanding of what management had been told. Schlender does not dispute that Gilles made such statements.

[7]Schlender disputes that she had a poor attitude or was rude to customers or made the workday uncomfortable for other employees, but fails to dispute that Dino LaLicata may have observed her and drawn his own conclusions.

[8]Schlender objects, saying her attitude was not sour, but, again, whether Gilles' belief was accurate is not the point. The statement is offered by Boulder Junction not for its truth about Schlender but for what Gilles thought and what he told the LaLicatas.

[9]Schlender denies she was speaking on a cell phone or said such words, but provides no evidence contradicting Gilles' statement that he told management she was. (*See* Pl.'s Resp. ¶¶ 28, 29; Gilles Aff. ¶¶ 6-7.)

7

The LaLicatas state that over the last couple weeks of Schlender's employment they received several complaints from customers about her service. (DPFOF ¶ 25.[10]) However, Schlender's tips remained constant. (Schlender Aff. ¶ 25.)

Gilles believed that it was in Boulder Junction's best interest to terminate her employment so as to better serve customers and maintain a peaceful work setting. (DPFOF ¶ 38; Gilles Aff. ¶ 10.) He joined Dominic, Dino, and Tom LaLicata in making the decision to terminate Schlender. (PPFOF ¶ 37; (DPFOF ¶ 38; Dominic LaLicata Aff. ¶ 21; Dino LaLicata Aff. ¶ 10; Tom LaLicata Aff. ¶ 9; Gilles Aff. ¶ 10; Lewison Aff. Ex. 17 at 11.)

Schlender was never informed of customer complaints about the service she provided. (Schlender Aff. ¶ 25) Further, she did not fail to pay for restaurant food that she ordered or hide food she had not paid for. (*Id.* ¶ 29). Moreover, no one with whom Schlender worked told her that she made the workplace stressful by creating conflicts with other employees. (*Id.* ¶¶ 33, 37) To Schlender's knowledge, she did not fail to highlight that she had added gratuity on customer checks. (*Id.* ¶ 31.) And she did not talk on her cell phone while working such that it caused her to provide poor customer service. (*Id.* ¶ 32.) Lastly, the LaLicatas and Gilles did not notify Schlender of any criticisms regarding her ability as a waitress. (*Id.* ¶ 38.)

On August 19, 2004, at 4:37 p.m., Schlender arrived at the City of Brookfield Police Department to file a sexual assault complaint against Braun. (DPFOF ¶ 50.) Police Officer Marek Kotrly took Schlender's complaint that Braun had assaulted or touched her inappropriately. (DPFOF ¶ 51.) Schlender stated that on July 30, 2004, Braun, had poked

---

[10]Schlender objects to this statement as hearsay, but again it is not offered for the truth of the matter asserted. She also objects because she was never informed of such complaints. That she was not informed of complaints does not draw into question that customers complained about her.

8

her in the stomach, commented "Oh, there's a baby in there" or something similar, and then slapped her buttocks with an open hand. (DPFOF ¶ 53.) Schlender told Kotrly that there were no witnesses in the Boulder Junction kitchen when the incident occurred. (DPFOF ¶ 57.) She advised Kotrly that Boulder Junction had written Braun up for the incident but that Boulder Junction refused to give her a copy of the write-up. (DPFOF ¶ 55.) Schlender acknowledged to Kotrly that she had been fired prior to her arrival at the police station. (DPFOF ¶ 52.)

After Schlender reported Braun's assault to police, Dino LaLicata wrote a letter to the Brookfield Police Department. (PPFOF ¶ 42; Def.'s Obj'ns to Pl.'s Proposed Findings of Fact ¶ 42.[11]) He stated:

> I heard from fellow employees that [Schlender] was going to file a claim against Ronald and Boulder Junction Restaurant for the alleged sexual harassment. I also have heard through other employees that Jessica was planning on filing other law suits to sue if she was ever to be fired. This is a direct quote from Jessica Slinger [sic] that other employees came to let me know about, "They don't know who they're fucking with I'm going to come to work late and do what I want. They can't come and do shit because I will sue there [sic] asses." Many of my employees are willing and able to testify to this statement repeated by Jessica Slinger [sic] if necessary.
> . . . .
> . . . . Jessica Slinger [sic] had been stirring up trouble and a horrible manner for the last couple of months of her employment. She has repeatedly been rude to customers as well as many employees. She also has been known to start troubled incidents with other employees that have become very problematic.
> As I have mentioned earlier I can provide further statements from other employees confirming and illustrating the threats made by Jessica Slinger [sic] to my establishment

---

[11]Boulder Junction says Schlender's proposed finding is incomplete, but provides no cite to evidence for its response. Further, it does not deny that Dino LaLicata wrote such a letter.

9

and Ronald Braun. Jessica was let go for other reasons that
had absolutely nothing to do with Ronald Braun.

(Rettko Aff. Dino LaLicata Undated Letter.)

The Brookfield Police Department forwarded the case to the district attorney because alleged sexual assaults are priority cases to be reviewed by the district attorney's office. (DPFOF ¶ 58.) Waukesha County Sheriff's Department Investigator David Witkowski was assigned by a deputy district attorney to investigate Schlender's allegations. (DPFOF ¶¶ 59-60.) He was to locate witnesses for the alleged sexual assault, and get an exact time as to when the incident took place on July 30, 2004, to assist in tracking down those witnesses. (DPFOF ¶ 61.)

Schlender reported to Witkowski that the sexual assault occurred between 7:00 and 8:00 p.m. on July 30, 2004, and that when the incident occurred she and Braun were the only people in the kitchen. (DPFOF ¶¶ 62-63.) July 30, 2004, was a Friday. (DPFOF ¶ 68.) Friday evenings from 7:00 to 8:00 p.m. are usually the busiest times for Boulder Junction, with the kitchen staffed by a manager, a cook, an expediter, bus persons, and wait staff. (DPFOF ¶ 67.) The Waukesha County District Attorney's Office declined to prosecute the case. (DPFOF ¶ 66; Rettko Aff. Witkowski Dep. at 23.[12])

On December 28, 2004, Schlender signed an Equal Employment Opportunity Commission Charge of Discrimination against Boulder Junction, indicating that the sexual assault by Braun occurred on or about early August 2004, with discrimination occurring

---

[12] Schlender objects to the proposed finding on grounds of relevance and hearsay, but does not dispute that Braun was not prosecuted for the incident. Because the court cites the fact only for completeness regarding involvement of law enforcement officers, the court will not divert into a discussion of whether Witkowski had personal knowledge or whether the deputy district attorney's letter declining prosecution is admissible. Resolution of this side-issue is unnecessary for present purposes, as the failure of the district attorney to prosecute has no bearing on this court's summary judgment decision.

10

between August 3 and August 19, 2004. (DPFOF ¶ 69.) On June 13, 2005, Schlender filed a discrimination complaint with the Equal Rights Division (ERD) of the Wisconsin Department of Workforce Development (DWD), asserting that Boulder Junction discriminated against her on the basis of her sex and pregnancy. (DPFOF ¶ 70.) In the ERD complaint, Schlender indicated that it was not until between August 14 and 17, 2004, that she complained to Dino LaLicata about Braun's assault. (DPFOF ¶ 71.) In response to Boulder Junction's request for admissions in this case, Schlender stated that the incident with Braun occurred on July 24, 2004, rather than July 30, 2004. (DPFOF ¶¶ 72-73.)

Schlender applied for unemployment compensation, which was challenged by Boulder Junction. The DWD Unemployment Insurance Division held a hearing on Schlender's eligibility for unemployment compensation on September 28, 2004. (PPFOF ¶ 35.) At the hearing, Dominic LaLicata testified that Schlender was fired for repeated tardiness, written warnings, not following the rules, and eating food without paying for it. (PPFOF ¶¶ 36, 40, 41; UC Tr. at 6, 10-11, 16-21.) During the hearing, LaLicata presented copies of warnings to Schlender regarding tardiness and a warning indicating that Schlender failed to pay for food. (PPFOF ¶¶ 38-39.) Boulder Junction's written warnings to Schlender dated August 10, 2004, and August 17, 2004, are on file in support of summary judgment. (Rettko Aff. Exs. 12-13.) However, they are not countersigned by Schlender (*id.*) and she denies having received them (Lewison Aff. Ex. 17 at 11-13, Ex. 19 at 27; Schlender Aff. ¶ 39).

Dominic, Dino and Tom LaLicata now maintain that they decided to terminate Schlender for being habitually late and for breaking numerous other restaurant policies, as

11

well as bad work attitude and inability to work with other employees without disrupting the workplace. (Dominic LaLicata Aff. ¶ 21; Dino LaLicata Aff. ¶ 10; Tom LaLicata Aff. ¶ 9.)

DISCUSSION

Title VII forbids workplace discrimination against an employee "with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), and discrimination against an employee in retaliation for opposing a practice otherwise made unlawful under Title VII, 42 U.S.C. § 2000e-3(a). Discrimination under Title VII includes sexual harassment in the workplace, *Phelan v. Cook County*, 463 F.3d 773, 782-83 (7th Cir. 2006), retaliation against an employee because the employee has complained of illegal discrimination, *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007), and termination based on a person's pregnancy, 42 U.S.C. § 2000e(k). Schlender asserts each of these claims. (Am. Compl. ¶ 101.)

To establish a prima facie case of sexual harassment, a plaintiff must show that (1) she was subjected to unwelcome harassment, (2) the harassment was based on her sex, (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere, and (4) there is a basis for employer liability. *Kampmier*, 472 F.3d at 940. However, an employer is liable for coworker harassment only if the employer negligently failed to take reasonable steps to discover or remedy the harassment. *Loughman v. Malnati Org., Inc.*, 395 F.3d 404, 407 (7th Cir. 2005). Greater vigor in remedying a situation is required when the harassment is physically assaultive. *Id.*

12

A plaintiff may show that she was the victim of pregnancy discrimination or impermissible retaliation in the workplace either through direct evidence of discrimination or through the indirect, "burden-shifting method" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Griffin v. Sisters of St. Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2007) (discussing direct and indirect method of proof for pregnancy claim); *Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007) (stating that a prima facie case of retaliation may be proved directly or indirectly); *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 896 (7th Cir. 2003). Under the direct method of proof, a plaintiff may show either through direct or circumstantial evidence that the employer's decision to take an adverse employment action was motivated by an impermissible purpose. *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 529 (7th Cir. 2003). The indirect method of proof requires that a plaintiff first establish a prima facie case of discrimination or retaliation. *Johnson*, 325 F.3d at 897.[13] If she establishes a prima facie case through competent evidence, the burden of production shifts to the defendant to offer a legitimate, noninvidious reason for its actions. *Id.*; *accord Griffin*, 498 F.3d at 844. If the defendant meets that burden, the burden shifts to the plaintiff to show that the defendant's reasons are pretextual. *See Griffin*, 498 F.3d at 844; *Johnson*, 325 F.3d at 897. A plaintiff may establish pretext with evidence that the defendant was more likely than not motivated by a discriminatory reason

---

[13]To establish a prima facie case of retaliation under the indirect method, Schlender must show that she (1) engaged in statutorily protected expression, (2) met the employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected expression. *Kodl*, 490 F.3d at 562. To establish a prima facie case of pregnancy discrimination under the indirect method, Schlender must show that (1) she was pregnant and her employer knew she was pregnant, (2) she was performing her duties satisfactorily, (3) she suffered an adverse employment action, and (4) similarly situated employees not in the protected class were treated more favorably. *See Griffin*, 489 F.3d at 844.

13

or that its explanations are "not worthy of credence, i.e., that they are factually baseless, did not actually motivate the defendant[], or were insufficient to motivate the adverse employment action." *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002). Generally, evidence that calls truthfulness into question precludes summary judgment. *Id.*

A. Schlender's Sexual Harassment Claim Goes to Trial

Schlender's sexual harassment claim survives for trial because Boulder Junction failed to attack that claim in its opening summary judgment brief. Boulder Junction's discussion is titled: "Schlender was terminated for consistent tardiness and for failing to follow rules." (Def.'s Br. in Supp. of Mot. for Summ. J. at 2.) Boulder Junction begins with the argument that it "is entitled to summary judgment and a dismissal of plaintiff's (Schlender) claim because it is undisputed that Schlender was terminated for being consistently tardy to work and for violating several work rules," and then identifies Schlender's complaint as asserting only that she was terminated in retaliation for filing a harassment complaint and because of her gender. (*Id.*) Boulder Junction then discusses its proffered reasons for terminating Schlender. Although Boulder Junction mentions the incident of Braun's physical assault on Schlender and its response to Schlender's complaint at the time, it does so as part of its argument that she was fired for reasons other than retaliation: "[i]t is difficult to imag[ine] that management would terminate Schlender when they in fact investigated her complaint." (*Id.* at 6.)

Whether Boulder Junction was justified in terminating Schlender is not dispositive of her sexual harassment claim. Regardless of whether Schlender was fired she could have sued for negligent failure to remedy coworker sexual harassment during the time prior to her termination.

14

In its reply brief, Boulder Junction raises a good argument that it took reasonable steps to promptly correct Braun's harassing behavior and that Schlender did not consider many of Braun's comments prior to the July 30, 2004, incident to be offensive. However, the argument is raised too late for summary judgment purposes. A reply brief is limited to matters in reply, Civil L.R. 7.1(f), and cannot be used to raise arguments that could and should have been raised in the opening brief such that the nonmovant could respond to them. Nor did Schlender's response open the door to Boulder Junction's late attack. Schlender notes only that Boulder Junction's apparent sole defense on the sexual harassment claim in its opening summary judgment brief was its belief that the incident with Braun did not happen.

B.  Schlender's Claims of Retaliation and Pregnancy Discrimination Survive

In its opening brief, Boulder Junction skips any attack on a possible direct method of proof by Schlender and any identification of or challenge to the elements of Schlender's prima facie case under the indirect method. Instead, Boulder Junction identifies its burden, in the indirect test, of coming forth with a legitimate, nondiscriminatory explanation for Schlender's firing and delves into discussion of various nondiscriminatory reasons for her termination, including her tardiness, failure to follow rules regarding paying for restaurant food, failure to highlight gratuity added to a customer's bill, cell phone use while working, attitude, and customer complaints. Thus, for purposes of this summary judgment motion, Boulder Junction has not presented this court with uncontested facts indicating that Schlender is unable to establish a prima facie case for retaliation and pregnancy discrimination.

15

Although Boulder Junction has presented evidence of legitimate reasons for firing Schlender, Schlender successfully rebuts those reasons with evidence of pretext, creating a genuine issue of material fact for trial. At the time he fired Schlender, Dominic LaLicata told her she was fired because she was "causing too many problems around the workplace." (Pl.'s Resp. ¶ 14; Lewison Aff. Ex. 17 at 25, Ex. 19 at 49.) That statement is ambiguous and can be interpreted, as it must at this stage, as referencing the Braun incident, any problems and bad feelings among the staff resulting therefrom, or Schlender's threats to sue or go to the police about the sexual harassment. Dino LaLicata told the Brookfield police that Schlender had been known to start trouble with other employees. Even now, the LaLicatas point to Schlender's inability to work with other employees without disrupting the workplace as a basis for her termination. (Dominic LaLicata Aff. ¶ 21; Dino LaLicata Aff. ¶ 10; Tom LaLicata Aff. ¶ 9.) Again, these statements are ambiguous and may be interpreted to mean Schlender's physical attractiveness to Braun or her reports of his behavior after he poked and patted her. A jury, not this court, will have to interpret what the LaLicatas meant when they said Schlender caused too many problems in the workplace.

Further, Boulder Junction says that Schlender was fired for tardiness. But many other employees were late at various times, yet were not written-up, let alone fired. Importantly, the LaLicatas admit that they were lenient regarding tardiness as long as an employee called in or received prior approval and that no other employees had been disciplined for tardiness because they had all called in or received permission. Schlender says she had such permission, thus rebutting the LaLicatas' differentiation of her from other employees. The LaLicatas point to Schlender's tardiness and their policy, but the

16

evidence shows that Schlender complied with the policy, indicating that this reason may be false.

Boulder Junction contends that Schlender had been written-up in November 2003, with a warning that she would be fired if it occurred again. But the evidence shows she met the tardiness policy by getting permission. Further, even if Schlender had not received permission to be tardy, for nine months after the November 2003 warning, she punched in late without any discipline, just like several other employees. The proximity in time between Schlender reporting the Braun incident and her termination (just three weeks), although not dispositive, *see Kodl*, 490 F.3d at 563 (stating that suspicious timing *alone* rarely creates a triable issue), supports a finding that Schlender's report of Braun's harassment, possible threat to sue or to go to the police suggest that the reasons given for Schlender's termination was pretextual.

Schlender presents evidence that Boulder Junction manufactured reasons for her termination only after it occurred. She says she did not receive two of the written warnings that Dominic LaLicata presented at the unemployment compensation hearing, and those documents were not countersigned. Neither were Schlender's November 2003 warning and Braun's warning. A reasonable jury could find that Boulder Junction wrote those warnings after she was terminated.

Finally, Boulder Junction's reasons for firing Schlender have changed as Schlender's claims have progressed. Initially, Dominic LaLicata told Schlender she was fired for causing problems at work. At the unemployment compensation hearing, he testified that Schlender was fired for repeated tardiness, written warnings, not following the rules, and eating food without paying for it. In this lawsuit, the LaLicatas add that

17

Schlender had a bad work attitude and customers complained about her. On this last point, Schlender's tips did not decrease during her last few weeks of employment, thereby supporting her claims that this is untrue. But, in any event, this expansion of explanations suggests that the reasons proffered for Schlender's termination are not the true reasons for her termination. *See O'Neal*, 293 F.3d at 1005-06 ("[W]hen an employer gives one reason at the time of the adverse employment decision but later gives another which is unsupported by the documentary evidence, a jury could reasonably conclude that the new reason was a pretextual, after-the-fact justification.").

Boulder Junction argues that Schlender has little credibility, as she has given several different dates for the incident with Braun. But Schlender's credibility is best determined by a jury, not this court. *See Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (stating that at summary judgment, the court may not determine credibility, weigh the evidence, or decide which inferences to draw from the facts).

To be sure, Boulder Junction presents evidence that Schlender's termination was justified. But this is summary judgment not trial, and Schlender has presented just enough evidence that these reasons are pretextual to survive Boulder Junction's motion. Genuine issues of material fact exist and a jury will have to decide the matter.

CONCLUSION

For the above-stated reasons,

IT IS ORDERED that Boulder Junction's motion for summary judgment is denied.

18

IT IS ORDERED that a scheduling conference to set final pretrial conference and jury trial dates, and to discuss whether further mediation of this case would be fruitful, will be held Wednesday, **October 17, 2007, at 11:30 a.m.**, in Courtroom 222, U. S. Courthouse, 517 E. Wisconsin Ave., Milwaukee, Wisconsin.

Dated at Milwaukee, Wisconsin, this 24TH day of September, 2007.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge